### JIM ELLIS v. THE STATE.

*No. 3100.    Decided March 20.*

**Murder—Fact Case.**—See the statement of the case for evidence held insufficient to support a conviction for murder of the first degree.

APPEAL from Parker County. Tried below before Hon. J. W. Patterson.

The indictment charges that the defendant, on or about the 5th day of February, 1890, in Parker County, Texas, with malice aforethought, killed and murdered Riley Swan, by shooting said Swan with a pistol.

Upon a trial of the cause the defendant was found guilty of murder in the first degree, and his punishment assessed at confinement for life in the penitentiary.

T. J. Overmire, a witness for the State, testified as follows: I was a justice of the peace, and on the 7th day of February, 1890, held an inquest over the body of Riley Swan, the deceased. He was a negro man. His dead body was in the house where it was said he had been living. Deceased, when I arrived at the house, was lying on his back on a pallet on the floor. He was lying in front of the fire place. There was one door to the house, on the south side, I think. There was only one bed in the house; it did not look like any one had been lying on it. The deceased had an overcoat under his head, and had a quilt or blanket over him that covered him up completely. Upon an examination I found a gunshot wound on the deceased, on the right side, just below the armpit. His clothes were all burned for six inches above and below the wound; his skin was also burned to a crisp around the wound. I do not know the kind of goods deceased's clothes, that he had on, were made of. He had on all his clothes, except his shoes, and perhaps his coat. The rats had eaten his right eye out, and had eaten all the flesh off his nose and upper lip. The house was in general order; could not see any blood on the outside, and very little on the inside of the house. There was a little blood on the hearth, where the rats had been dragging the flesh into a hole. I took his clothes off to see if there were any more wounds on him. He did not have any

weapon on his person. There was a small pistol on the mantelpiece; looked like a 22 caliber. It had two or three loads in it, and looked like it had not been recently fired. From all appearances I think deceased had been dead at least two days. It was about eight miles from deceased's house to Weatherford. It was between 3 and 4 o'clock p. m. that I held the inquest. Dr. Morse was with me. This all occurred in Parker County, Texas.

Cross-examined: It was about five miles from Aledo, where I lived, to the house of the deceased. When I got there no one was in the house. There were twenty-five or thirty negroes on the outside. They had a fire about ten or fifteen feet in front of the house. I think they had been there all day. The field was one hundred yards from the house. The deceased was lying on his back, on two or three old quilts, covered up. His shoes were off; he had on his shirt and pants. The wound was on the right side, just below the armpit. There was no blood on his clothes that I could see, or on his quilt and blankets. I could not tell the difference in the holes made by a 38 and 42 caliber pistol. I could not see where the bullet came out. Dr. Morse probed the wound to the depth of about an inch. I looked over the house carefully for evidence that might lead to the cause of deceased's death, but could not find any. The bed was not rumpled any. Could not find where a bullet had lodged in the house. Could not find any track around the house. It is rocky for some distance around the house. It is about one hundred yards from the house to any ground soft enough for a person to make a track. I did not go to the lot to look for tracks. Mrs. Williams' house is the nearest one to deceased's. I do not know how far it is to a public road from the house of deceased. I think the body had been dead about two days, because it smelled bad. There was very little blood; some on the quilt under and below his head. There was a bloody place on the quilt under him about as big as one's hand.

Dr. O. Morse, a witness for the State, testified as follows: I am a physician; live at Aledo, Texas. On February 7, 1890, Justice Overmire requested me to assist in holding an inquest over the dead body of Riley Swan. The dead body was in the house where deceased had been living. Two wounds had been inflicted on deceased. There was a gunshot wound in his right side, just under his armpit, between the fourth and fifth ribs. The other wound was on his head just above the left eye. It looked like it had been made with the butt end of a pistol. The left eye was bruised into a jelly. The right eye looked like it had been eaten out by rats. The flesh had been eaten off his nose by rats. The ball which entered between the fourth and fifth ribs ranged backward and upward. I think deceased was in a sitting posture when he was shot. I think the caliber of the gun that the deceased was shot with was about 40, judging from the size of the wound. I have

examined a good many gunshot wounds in my life. The gunshot wound was a mortal wound; would have caused instantaneous death. The wound on the head might have caused death. The deceased was lying on his back, with his head to the south and his feet to the north. The bed was in the west end of the house. He had on his clothes—that is, shirt and pants. His shirt was burned around the wound. I don't know what caused it. The skin was also burned around the wound. We did not find any weapon on the person of the deceased. There was a pistol on the mantelpiece that looked like a 22 caliber, and it had two or three loads in it. It did not look like it had been fired recently. I do not think that pistol was large enough to have made the wound that was on the deceased. The deceased's shoes were in the southeast corner of the cabin. Judging from the appearances, I think the body had been dead about three days. Deceased's house was not near any public road. Mr. W. H. Williams lived about one-half mile from deceased, and Dick Hood about three hundred or four hundred yards from him. There was no fire in the fire place, and it looked like there had not been any for several days. The body, they said, had not been moved when I got there. I did not know Riley Swan. I knew several of the Swans, but did not know one from another. I have been living in that community eight years. The house of deceased was located in the brush. I do not know the defendant.

Cross-examined: When Justice Overmire and myself reached the house of deceased, Dick Hood, old man Swan, Charley Swan, W. H. Williams and others were there. Sam Lemons, Overmire and myself went there together. I could not say whether or not the body had been moved. I think the wound on the head had been made with the butt end of a pistol, or with some other blunt instrument. I probed the wound in the side about two inches. I think deceased when shot was sitting up, or he may have been standing up. There may have been a little blood on the bed clothes. Deceased was lying on a pallet on the floor, and was completely covered up except his head, which may have been partially covered. I did not find any other wounds than those I have described. I searched for evidence that would lead to the cause of the death, but could not find any. I looked all around in the house and also on the outside. I did not find any tracks. There was a corn pen and stables about one hundred yards from the house, but I did not go there to look for tracks. There was very little blood. There was a bloody place on the quilt a little larger than one's hand.

Dr. P. Holt, a witness for the State, testified as follows: I live at Weatherford, Texas. Have practiced medicine about fifteen years. On February 7, 1890, I examined the dead body of Riley Swan. I examined it at the house of Lewis Swan, the father of deceased, and after the inquest had been held. I found that deceased had been shot through

the head.   The ball entered the head behind, a little beneath the crown, and came out at the right eye.   The firearm was not close enough to powder-burn the hair.   The right eye had been torn out by the bullet. Deceased had been prepared for burial, and we did not undress him.   I only examined his head.   This wound in the head was a mortal wound; I think it caused instantaneous death.   I think from appearances the body had been dead twenty-four or thirty-six hours.   Deceased's hair was kinky and long.

Cross-examined:   I examined the dead body at the request of Henry Swan, a brother of the deceased.   They told me about a wound that was in the right side.   The ball was out of his right eye.   The left eye was intact; there was no wound about it, and the orbital bone was not broken.   There was a wound on the right eye, which I thought was made by the body falling on that side.  · I do not know what day of the week it was that I made the examination, but it was February 7, 1890, about sunset.

Henry Morris, a witness for the State, testified as follows:   I knew Riley Swan.   Saw him after he was dead on February 7, 1890, in Parker County, Texas.   I went to his house on that day about 10 o'clock, and saw him dead.   He was lying on his back on a pallet on the floor, his hands folded across his breast, with an overcoat under his head. His head was toward the south and his feet toward the north, in front of the fire place.   His shoes were in the corner of the cabin, and his socks were in his shoes.   He was covered almost entirely with a quilt or blanket.   There was one woolen quilt that was very heavy, under him, and it had blood on it.   There was a gunshot wound in his right side.   I could see the wound without moving the quilt that was over him.   His left eye was out.   The rats had eaten his lips off, and all the flesh from his nose.   Perhaps there was a little blood on the hearth, and there was a little on the overcoat and quilts.   There was a bed in the house, which looked like some one had slept in it.   It was rumpled, and the cover was turned back like some one had turned it back and gotten out of bed.   I looked in and around the house for evidence that would lead to the cause of his death, but could not find any.   I looked for tracks, but found none.   I went to the lot to look for tracks, but did not see any.   I saw some straw on the ground in the lot that looked as if some one had fed a horse there.   Deceased was a witness in a criminal case at Granbury, in Hood County, against George Upshaw, Jr., who, it is alleged, had stolen a horse from Riley Swan and a black man by the name of Owens.   I was at Granbury when the case was tried.   Upshaw came clear in the case for stealing Owens' horse.   It was in March, 1889, that the case was tried.   [The State here read in evidence two indictments presented in the District Court of Hood County, Texas, at the September Term, 1889, of said court; one charging George Upshaw with the theft of a horse the property of Riley Swan, and the other charg-

ing said Upshaw, in the first count, with the theft of a horse the property of Riley Swan; the second count charging the theft of a horse the property of Riley Swan and Henry Swan, and the third count charging the theft of a horse the property of Henry Swan.]

Deceased left home during the fall of 1889, just before the District Court in Hood County, and was gone for a week or two. I was at the train when he came back. I had heard that they wanted him at Granbury for a witness in February. On the Saturday before the deceased was killed I went on his bond that he would appear before the District Court of Hood County at the March Term, 1890, as a witness in the case against said Upshaw. The horses that said Upshaw was charged with stealing were stolen in January, 1889. I was well acquainted and intimate with the deceased. I do not think he had an enemy in the community. I had never seen the defendant until I saw him here last spring under arrest. Deceased was living by himself—"keeping bach." George Upshaw, Jr., was the son of George Upshaw, Sr., who is a witness in this case. The colored people were a mere handful compared with the white people in that community. This all occurred in Parker County, Texas.

Cross-examined: I have been in this county about seven years. There were several persons at the house of deceased when I got there, but I don't remember who they were. I went to the door and looked at deceased. I have never testified before about the woolen quilt. Mr. Sisk, Mr. Fondrew, and myself went on Sunday after the killing to deceased's house to look for evidence that would lead to the cause of deceased's death. I could not say whether or not any one had moved or changed anything in the house, or the dead body, when I was first at the house. I do not think they had. I could not find any tracks; there had been so many persons about the premises that I could not distinguish one track from another. I do not know where deceased went to when he left home in the fall. I know the officers were searching for him while he was gone. The weather on Thursday was pretty cool. I killed hogs on Friday. Deceased was a particular friend of mine, and my feelings are and were very friendly toward him, and we were together considerably.

Lewis Swan, a witness for the State, testified as follows: Riley Swan, the deceased, was my son. I first saw him after he was dead on Friday, February 7, 1890. He was buried on the next day. He had been living by himself. The last time I saw him alive was on Monday before I saw him dead on Friday. Several persons were at the house of deceased when I got there on the day his dead body was discovered. Justice Overmire held an inquest, and after the inquest the dead body was removed to my house. I live about eight miles east of Weatherford; have lived there about thirty years. Deceased was about twenty-one years old at the time of his death. He was raised in that community, and if

he had an enemy I did not know it.   He was shot in his head and side. Dr. Holt came to my house and examined the dead body.   There were no wounds on the body when Dr. Holt examined it except those that were on it when it was found.   Deceased's cabin was about eight miles east of Weatherford, in Parker County, Texas.   He had no money or property to amount to anything.   I took care of his horses after his death, and they were not shod at the time of his death.

Cross-examined:  I got to deceased's house about 9 o'clock a. m.   One of the school children told me about the dead body being found.   When ·I got there deceased ·was lying on the floor covered up.   I do not remember who took the cover off.   I did not notice the bed.   Henry Morris did not call my attention to the bed.   Some of them looked for tracks; I did not.   Several went to the lot to look for tracks, but I did not hear any one say they saw any.   I think they saw some horse tracks, but deceased had two horses that were found in the lot.   We did not move the body nor let any one disturb it until the justice came.   The horses of deceased were not shod.   I recognized the body found in the cabin dead as my son Riley Swan.

Charles Swan, a witness for the State, testified as follows:  I am a brother of Riley and Henry Swan.   The last time I saw Riley Swan alive was on Wednesday, the 5th day of February, 1890.   He was then plowing in Mr. Williams' field.   I was plowing close by in my father's field.   Deceased's house could not be seen from where he was plowing, and was about a half mile distant.   Deceased was living by himself, "keeping bach," and working some of father's and some of Mr. Williams' land.   I saw deceased while he was lying on the floor dead.   I did not look for tracks around the house.   I saw some horse tracks in the lot made by a horse that had on shoes in front.   Riley's horses were not shod.   The tracks I saw were made by a horse with small feet.   The first time I ever saw the defendant was on Wednesday, the 5th day of February, 1890.   He came to where I was plowing.   He said he was hunting four head of horses, one dun mare, one sorrel mare, one sorrel horse, and one light bay horse, each branded half circle T 6.   He had on a red necktie, a white hat with a black shoestring around it, boots with high heels, or cowboy boots, and wore a pair of gloves with mixed gray gauntlets.   He told me he had been to a dance the night before. He told me that he had had the smallpox, and I could see that he had, judging from the scars on his face.   He asked me about the Swan boys, saying he was well acquainted with Henry Swan; that he had lived at Weatherford.   I then told him I was one of the Swan boys.   He then said he had heard that the Swans were good horse hunters, and that he would give me $5 if I would go and help him hunt out the range.   He told me in the same conversation that Mr. Church had told him the night before at the dance that he (Church) had seen some estray horses in the range, or had seen some one that had seen them.   I told him I would

not help hunt his horses, as I was too busy at work, but that if he did not find them by Sunday I could help him then. I asked him what I should do with the horses if I found them. He said to leave them at Weatherford, that anybody there would know who he was, as he had lived there a long time. It was about 10 o'clock a. m. when he came to where I was plowing, and he remained about one hour, but did not get off his horse. I do not know that his horse was shod. It was a bay horse; I did not notice its feet. Defendant asked me who that was plowing in the other field. I told him that it was Riley Swan. When defendant left me he went to where deceased was plowing, and I suppose talked to him about one hour. I did not see the defendant get off his horse when he was talking to deceased. Deceased was breaking ground, and was plowing on a land that he had been plowing around about one day, and when he plowed to the corner of his land, and turned around, he was about ten or fifteen feet from the fence. Deceased stood at the corner of his land and talked to defendant, while defendant sat on his horse outside the fence. I continued plowing, now and then looking at them. I could not hear anything they were saying. I suppose they were talking about an hour, and they were about four hundred yards from me. When defendant left deceased he came back to where I was, and talked with me about twenty minutes. He said that if I would find the horses he would give me $25. I did not hunt for the horses. He told me he lived seven miles west from Weatherford. I asked him to give me a description of the horses, and he replied that he did not have any paper or pencil. [Here the State introduced in evidence the following document: "Too horses, 1 sirl & bay, sirl mair & 1 dun yeller $\frac{T}{6}$. James Johnson."] This document, the witness testified, was found in deceased's Testament after his death, when his things were moved to his father's house. Deceased was a poor man, and had no money. Deceased plowed all Wednesday evening. Defendant was a stranger in that community. I had never seen him before, nor since, until I saw him under arrest. The description of the horses in the document found in deceased's Testament is in deceased's handwriting. There was a white man plowing in the same field deceased was in, but in a different part of the field. Defendant asked me who it was, and I told him.

Cross-examined: The conversation I have related occurred Wednesday morning, February 5, 1890. I was renting land from my father. Defendant talked to me about one hour. The first thing he said when he came to me was to inquire for the horses. During the conversation he asked me if I knew the Swan boys, saying he had heard they were good horse hunters. He spoke of being at a dance the night before at Mr. Carrol's. It is about one mile and a half from deceased's house to the Clear Fork bridge. When defendant came back after he had talked with deceased, he said if I could find the horses he would give me $25. He did not get off his horse while talking with deceased that I know

of.  I could not see them all the time they were talking, because the land I was plowing had a swag through it, and the land was about two hundred and fifty yards long, and while plowing one way my back would be to them, and the swag would cause me to be out of sight of them while plowing across the swag.  I quit plowing that evening about sundown, and before deceased quit.  I did not notice anything strange or suspicious in the actions of defendant.  He talked naturally, and acted like a man hunting horses.  I went to the house of deceased when I heard he was dead.  He was lying on his back with his hands folded across his breast.  The whole body was covered with a quilt; I could not say what kind of a quilt it was.  I remained there until the body was taken to my father's.  I was told not to move the quilt from the body before the inquest was held.  I did not look for tracks, but several others did.  Several days thereafter Will Swan and I went to get deceased's things, and at that time I saw tracks of a shod horse in the lot, and also saw oat straw on the ground in the lot, where a horse had been fed.  In the first conversation I had with defendant I told him my name was Charley Swan.  Deceased had a 22 caliber pistol, which we found on the shelf with three chambers loaded; it had not been recently shot; was dry and rusty in the barrel.  There was fifty cents in his pockets when he was found.  After we found the dead body of deceased I saw where a horse, shod in front, had been fed with oats in deceased's lot.  The horse made small tracks.

Dave Kyle, a witness for the State, testified as follows:  I live ten miles east of Weatherford, in Parker County.  On February 5, 1890, the defendant came to my house hunting horses.  He described the horses as follows:  One dun mare, one sorrel mare, one sorrel horse, one light bay horse, each branded $\overline{T6}$.  When he came it was about dinner time, and at my invitation he ate dinner with me.  He told me he had lived at San Antonio, and named several stockmen who lived there that I was acquainted with.  He told me he then lived west of Weatherford with some of his kinfolks; that his name was J. E. Johnson.  He left my house about 1 o'clock p. m.  A few minutes after he left I heard three pistol shots in the direction he had gone.  I lived about three miles from the deceased.  I have never seen horses such as he described in that range.  I looked for them on Sunday, after he was at my house on Wednesday.  Defendant wrote his name in my daybook.  He asked me for my pencil to write it with, saying he had given his pencil to the bookkeeper at the dance the night before.  He asked me for paper, saying he had none.  When he started to write his name he first made something as if starting to make E, and erased it, saying he had never gone to school, and could not write well.  He had on a pair of high heeled boots, what we generally call cowboy boots, and had on a pair of gloves with mixed gray woolen gauntlets.  I could not say what number his boots were, but he had small feet.  I invited him to

come back and stay all night with me, but he said he would have to go to town that night. I could tell by the scars on his face that he had had the smallpox. He·was riding a bay horse. I could not say the horse was shod. He wrote his name in my book as J. E. Johnson. I asked him about the place he lived west of Weatherford, as I was well acquainted there. From the description of the place he said he lived, it was about ten miles west of Weatherford.

Cross-examined: Defendant came to my house about dinner time. He did not say where the horses were branded. The horse he was riding had one eye out. I did not see him have a large pistol. If he had had it on I think I could have seen it. He had a large overcoat tied behind his saddle, and could have had the pistol in the overcoat. It was about a quarter of a mile, I think, to where I heard the shots fired, and the defendant had only been gone about fifteen minutes on the public road. Defendant said that he did not have pencil or paper; that he gave his pencil to the bookkeeper at the dance the night before. There was a dance the night before at Mr. Carrol's. He told me he went to the dance with Jim Blackwell. When he left my house he went in the direction of Riley Swan's house. He left my house about 10 o'clock p. m., Wednesday, February 5, 1890.

Jim Blackwell, a witness for the State, testified as follows: I know the defendant. I saw him on the 4th day of February, 1890, at Mr. Carr's, on Clear Fork. He came there about sundown, inquiring for horses. He said there were two head branded 了ℰ. He told me his name was Jim Ellis. The next time I saw him he was in jail. He was not an acquaintance of mine. I had never seen him before that time. He and I went to the dance together at Carrol's. He danced one set. He asked me out of the house, and asked me if I would hold his pistol while he danced a set. He then gave me his pistol and I held it while he danced a set, and then gave it back to him. It was a large, bright, white-handled pistol. [Here the witness was shown the pistol which the sheriff took from defendant when he was arrested.] It looked like the pistol now shown me, but I could not say it is the same pistol. I did not notice that the handle of his pistol was broken. The pistol shown me is, I think, a 44 or 45 caliber.

Cross-examined: He said he knew me; that he had seen me on some cattle ranch. I introduced him to the girl he danced with. There is nothing about the pistol shown me by which I can identify it as the one he had at the dance. He remained at the dance until 10 or 11 o'clock. I do not know where he went to from there. I can not say when he left the dance. I work in Wielomd's saloon, here in town. He handed the pistol to me on the outside of the house. There was no light there, and it was not a moonlight night, just an ordinary starlight night. I did not see the pistol in the light, and did not examine it closely, and can only say it was a large, white-handled, nickel-

plated pistol, about like the one here shown me. Such pistols are common in this country, but these long ones are not so common here as they used to be. I have seen many such, but usually out west. When he came back from dancing I gave him his pistol.

Dave Ray, a witness for the State, testified as follows: I knew deceased. On Tuesday, February 4, 1890, about 12 o'clock m., I went over to one of my neighbors' houses on business. I did not go the road, but went a nearer way. At the back of my field, in the woods, I saw a bay horse tied, and saw a pair of gloves, with gray mixed woolen gauntlets, lying on the ground by the horse. I did not see any person near the horse. I went on to where I had started, and in about an hour I came back a different route, but through the woods, and about one hundred and fifty yards from where I saw the horse tied I saw a man on the same horse. I was not close enough to him to learn who he was. He was a small man with a white hat and overcoat on. The horse was hid from view of the public road, and could not be seen from the road because of the brush.

Cross-examined: I live about one and one-half miles north from where deceased lived. The horse was tied on the east side of my field, some distance from the road and near a trail leading through the woods. I could not tell who the man on the horse was. I was about one hundred yards from him. It was open land where I saw him, and frequented by range cattle and horses.

Kate Owens, a witness for the State, testified as follows: On Tuesday before Riley Swan was found dead, while I was at Mr. Ray's well, I saw a man standing out in the edge of a little prairie. When he saw me he walked backward into the woods. I do not know who he was. He was a small man with a white hat on; I could not say whether or not he had on an overcoat; he had on black clothes.

Cross-examined: It was about 12 o'clock m. when I saw the man. He was southeast from Ray's house. He was not close enough for me to know who he was. I can't say how far he was from me.

T. W. Harrington, a witness for the State, testified as follows: I live at Granbury, Hood County, Texas; have lived there since 1859. I know George Upshaw, Sr.; got acquainted with him in March, 1889, at Granbury. His son George was in trouble—accused of stealing a horse from a negro in Parker County, Texas. I had a conversation with the old man Upshaw at that time. He told me he did not have any money, but had good horse property that he would give to some one to get the negro out of the way at that term of the court, so that he would not be there to testify in the case against his son. I told him to see a negro by the name of Alf Waters. I then saw said Waters across the street, and went to where he was and made Upshaw acquainted with him.

Cross-examined: This conversation was in March, 1889. I do not know what negro he had reference to. He did not say he wanted the negro killed, but talked like he only wanted the negro to be absent during court. I did not hear the conversation Upshaw had with Alf Waters. I could not say what time in the day the conversation occurred. I am not acquainted with the defendant.

Alf Waters, a witness for the State, testified as follows: I live in Hood County, Texas. I do not know defendant. I know George Upshaw, Sr.; I got acquainted with him in March, 1889, at Granbury, Hood County, Texas. He told me then he would like for me to help him some; that he wanted me to get Riley Swan to leave the country, so he would not be present at the next term of the District Court, which would be the following September. The next September I came to Ben Gregg's, who lived on Woodhouse's farm, about fifteen miles south of Weatherford. Gregg and I came on to Weatherford that night, and got Henry Swan, a brother of Riley Swan, and we three went to Riley Swan's house, who lived about six miles east from Weatherford, and I gave Riley Swan $10 and Gregg gave him $10 if he would leave the country and stay away until the Hood County District Court adjourned. Riley Swan did not attend the September term of the court. When George Upshaw, Sr., came to Granbury in September, after I had bribed Riley Swan to leave, he gave me $1 at one time, staid all night with me and gave me $5 more, and said that he would give me a pony for what I had done, but I have not received anything more from him. Upshaw's case was continued at that September term.

Cross-examined: I am indicted in this court for bribery. I had an agreement with Mr. Morris, sheriff of Hood County, that if I would testify and tell the truth in this case, and in the Henry Swan case, that my case would be dismissed. I did not say on the Henry Swan trial that I had an agreement with the county attorney that if I would testify all right in that case and this one that he would dismiss my case. All that Upshaw said was that he would like for Riley Swan to be absent at the September term of the District Court of Hood County.

P. T. Klepper, a witness for the State, testified as follows: I live in Cooke County, Texas. I know the defendant by the name of Nat Brooks, not by the name of Jim Ellis. I am deputy sheriff in Cooke County. I am acquainted with George Upshaw, Jr. Defendant and George Upshaw, Jr., were in the Cooke County jail together from the 19th day of December to the 21st day of the same month, 1888. I also know George Upshaw, Sr. He came to Gainesville while his son was in jail in Cooke County. When defendant was in jail in Cooke County he told me he lived in the Nation.

Cross-examined: George Upshaw, Jr., was in jail with defendant only two days. Defendant was in the jail from January to December 21, 1888.

Valley Goodson, a witness for the State, testified as follows: I live in Erath County, Texas, on Armstrong Creek, about two miles from George Upshaw's. I had a party at my house January 13, 1890. There was a man there by the name of Brooks. I do not know where he came from, or who he came with, or where he went to. I noticed he was acquainted with George Upshaw, Jr. I can not identify the man of whom I speak. I did not learn the Christian name of the man. George Upshaw, Jr., and his wife were at the party.

John Clifton, a witness for the State, testified as follows: I live in Erath County, Texas. I know George Upshaw, Sr., and George Upshaw, Jr. I was at a party at the house of Valley Goodson on the night of January 13, 1890. I was bookkeeper at the dance. There was a man there by the name of Brooks; I do not know his first name. I do not think the defendant is the man I saw there. I do not know who Brooks came with, or where he went to. George Upshaw, Jr., and his wife were at the party.

H. S. Sisk, a witness for the State, testified as follows: I am sheriff of Parker County. On Sunday, February 9, 1890, I went to the house where the deceased was killed, and staid there three or four hours. Spain Fondrew went with me, and perhaps Henry Morris. I went to W. H. Williams' house before going to deceased's house. I went into that community to get the description of a man I heard had been there about the time deceased was killed. I looked around deceased's house for tracks. I found a small track that had been made with a No. 5 or 6 boot or shoe. The track was in the plowed ground about sixty yards southwest from the house; could not say which way the person was going when the track was made. I noticed the track very particularly; it looked like it had been made by a high-heeled boot or shoe. The ground was soft, and I could see the impression made by the back of the boot. I only saw this one track at that place. I measured the track with a switch, or limb of a broomweed, I do not remember which. I measured the length of the boot defendant had on when he was arrested, and there was a little difference in the length of the track and the length of the boot. I do not remember whether I measured the defendant's boot with the same thing that I measured the track, and got the measure in that way. I was in the sheriff's office when I measured defendant's boot. I saw another track out in the road close to deceased's house; it was going from the house. I did not measure it, but it looked like it might have been made by the same boot or shoe that made the one in the field. It looked like it might have been made by a lady's shoe. I sent out a description of the man that had been described to me to different parts of the State, and especially to the counties of Hood, Erath, and Brown. A short time afterward I received a message from the marshal of Dublin that he had a man under arrest that suited my description. I then went and got the defendant, and brought him to Parker County and

put him in jail. Defendant was wearing a pair of cowboy boots with high heels. I got a daybook from him, it had a leaf in it with the name of "Wiley Swan, seven miles east of Weatherford," written on it; also some other names. I gave the piece to R. C. McConnell. [Here R. C. McConnell testified as follows: Mr. Sisk gave the paper to me, and I put it away among my private criminal papers. I have made diligent search for it everywhere it would likely be, and can not find it.] Witness Sisk, continuing, said: I did not know defendant before he was arrested. I do not think he ever lived in this county. I went to Erath County to look for him before he was arrested; went to Dublin, and went out to old man Upshaw's house, but could not hear anything of him, and came back.

Cross-examined: I could not state the exact length of a No. 5 boot. The track I measured in the field was a little longer than defendant's boot. The track was southwest from the house about sixty yards. I can not state whether the track was made before or after the rain, but think it was made before. I would not state that it was made with defendant's boot, but the impression I saw was such a one as a boot like the defendant's would make. The track I saw in the road looked like it might have been made with a woman's shoe. I did not show the track to Spain Fondrew or Henry Morris. I can not state the kind of stick with which I measured defendant's boot. I saw but one track in the field, and can not state which way it pointed. I can not state who made the track, as a great many people had been at the house the two days before. I looked for other tracks but found none except those in the road. The tracks in the road were on firmer ground than the track in the field, and I could have measured them, but did not do so. The tracks in the road looked as if some one had been walking up the road. I will not say defendant's boot or shoe made the tracks, but the impression I saw was made by a boot or shoe about the size of his, or a little larger. I may have measured defendant's boot with a piece of pine plank. I measured the track with a little limb.

Joseph Bishop, a witness for the State, testified as follows: I live in Erath County, Texas. I am city marshal of Dublin, and was when I arrested the defendant. I know defendant. The first time I ever saw him was in February or March last. He was then in George Upshaw's and Keith's saloon. Sheriff Shands, of Erath County, gave me a description of the defendant, and when I saw defendant in the saloon he suited the description that Shands had given me. I arrested defendant in said saloon. After I had arrested him and had started out of the saloon with him he called to Upshaw, saying, "Oh, George," three times. Upshaw came out of the saloon after I had arrested defendant, and said to me that that was his pistol that the defendant had, and that he wanted it. Upshaw was behind the bar when I arrested defendant. When Upshaw came out and asked for his pistol he seemed to be ex-

cited about something.  Upshaw was not present when I searched the defendant.  The defendant had a gray horse when I arrested him.  His saddle had goat skin pockets on it.  He gave his pocket book to George Upshaw, Sr.; do not know whether it had money in it or not.  He was wearing his hair long, and had a black mustache; had on a white hat and cowboy boots, about No. 3 or 4.  [A daybook was here shown the witness.]  This is the same book I got from defendant when I arrested him, and the leaves of the book correspond with and look like the leaf of paper found in Riley Swan's Testament.  [Here the white handled pistol was shown witness.]  This is the same pistol I got from defendant and delivered to Sheriff Sisk, and the same that Upshaw said belonged to him.  Defendant's gray horse died.  I had never seen defendant in that community before.

Cross-examined:  George Upshaw claimed the pistol, and when I refused to give it to him said he wanted me to take care of it for him.  It is seventy-five or eighty miles from Dublin to Weatherford.  I do not remember the day of the month on which I arrested defendant.  I know it was on Monday; think it was the last of February, 1890.  George Upshaw, Sr., lives about nine miles a little south of west of Dublin.  Dublin is southwest of Weatherford.

W. H. Williams, a witness for the State, testified as follows:  I knew deceased; lived seven hundred or eight hundred yards from his house.  On Wednesday night, February 5, 1890, myself and family had been to church, and after our return home, about 10 o'clock, I heard the report of a firearm.  I only heard one report, and it sounded dead and flat; did not echo; sounded like the report of a pistol or rifle.  It was a clear night.

Cross-examined:  We were in the house, sitting around the fire, and the doors were closed when I heard the report of the firearm.  I could not state the direction of the report.  I am not positive what night it was.  I have frequently heard the report of firearms at night; could not state whether it was a rifle or a pistol; do not think it was a shotgun.  It is nothing unusual to hear shooting in that neighborhood at night.

B. L. Shafner, a witness for the State, testified as follows:  I live at Dublin, Texas.  When defendant was arrested Bishop brought him to my saloon and left him there a short while.  Defendant gave Upshaw his pocketbook.  I can not state whether or not there was money in it.  Defendant told Upshaw to take care of it for him.

F. C. Varner, a witness for the State, testified as follows:  I knew Riley Swan.  I put him under bond to appear before the District Court of Hood County, as a witness in the case of The State v. George Upshaw, Jr., on the Saturday before he was killed.  I was at the time a constable in Parker County.  The bond was in the sum of $200, and Henry Morris, colored, was surety upon it.

Mrs. George Upshaw, Jr., a witness for the State, testified as follows: I do not know the defendant. The first time I ever saw him was yesterday, in the court room. I do not know for certain whether I ever saw him in Erath County. I live at George Upshaw's, Sr. I have lived there most of the time since I was married. I do not remember seeing defendant at the dance at Valley Goodson's. I did not tell Mr. McConnell that I saw defendant at the dance. I did tell him that there was a man there I did not know—the man that staid at our house; I did not know his name. I did not tell Mr. McConnell that the defendant had been at our house twice. In January and February, 1890, my husband and I lived at George Upshaw's, Sr., in Erath County, Texas.

Cross-examined: George Upshaw, Jr., is my husband. He is now in the penitentiary for the theft of Riley Swan's horse. I do not think I ever saw the defendant before I saw him here in court.

Henry Swan, a witness for the State, testified as follows: I am a brother of deceased. I did not know defendant before deceased was killed. The first time I ever saw defendant was last spring, when he was under arrest for the murder of my brother.

Cross-examined: George Upshaw, Jr., stole my brother's horse in January, 1889. I was present when Upshaw was tried and convicted for the theft. The horse was stolen from my possession from the court house yard in Weatherford. Deceased was not present when the horse was taken. I have on a pair of cowboy boots, No. 9. When the horse was stolen was when Henry Owens and I came to Weatherford, at about 9 o'clock p. m. I was riding deceased's horse. This was in January, 1889. In about thirty minutes after Owens and I got to Weatherford both our horses were stolen. Upshaw and a man named Light were accused of the theft. Light got away and was never arrested.

A. H. Cleveland, a witness for the defendant, testified as follows: I saw witness Sisk when he measured defendant's boot. He measured it in the sheriff's office, with a piece of pine plank. I was Sisk's deputy at the time.

Henry Morris, a witness for the defendant, testified as follows: On Sunday, after deceased was killed, I went with Sheriff Sisk to the house of deceased. I looked for tracks there but did not find any. I have on a pair of high-heeled cowboy boots, No. 8. Such boots are not as common as they once were.

Cross-examined: I did not own these boots at the time deceased was killed. High-heeled boots are not common in our neighborhood.

M. Keith, a witness for defendant, testified as follows: I live at Dublin, Texas. My father also lives there; also George Upshaw, Sr. My father and Upshaw, Sr., were partners there in the butcher business. We killed the beeves with a pistol. [Here the pistol taken from defendant was shown witness.] This is the pistol we used, or one just

like it.   This pistol was there when father went to Comanche to attend court, but I can not say what time in February that was.

Cross-examined:  I am 16 years old.   I was brought here by George Upshaw, Sr., with whom I am staying and sleeping, and he is paying my expenses.   I have been in the court house, and not under the rule with other witnesses.

I. T. Marshall, a witness for the defendant, testified as follows:  I live at Dublin, Texas, and have lived there for about thirty-two years. I know George Upshaw, Sr.   On Monday, the 3d of February, 1890, I cut beef for Keith & Upshaw; they had just gone into partnership. Keith had gone to Comanche to attend court as a witness, and hired me only for the time he was gone.   On the day named, about 10 o'clock a. m., Upshaw came into the shop with a pistol, and made some remark about it, and put it in a drawer under the counter; it was a large, bright, white handled pistol.   I saw the pistol in the drawer several times that day, and I think I saw it there the next day.   It was in the same place on Tuesday, between 12 and 6 o'clock.   [Witness was here shown the pistol taken from defendant.]   I think this is the same pistol I saw Upshaw put in the drawer; it is one just like it.   Keith was absent at Comanche about one week.   I think he left to go to Comanche on Sunday, February 2, 1890.

Cross-examined:  I know I saw the pistol on Monday, and think I saw it the next day, but I am not as positive that I saw it on Tuesday as I am that I saw it on Monday.

W. T. Sharp, a witness for the defendant, testified as follows:  I live in Dublin and know George Upshaw.   I was Upshaw's bar tender at the time defendant was arrested in the saloon.   I commenced work in the saloon February 8, 1890.   [The pistol taken from defendant was here shown witness.]   I think this is the pistol Upshaw kept about his business.   I do not remember about this piece being broken out of the handle.   This looks like the same pistol.   I saw it in the saloon when I went to work there.   Defendant and George Upshaw came to town together the day defendant was arrested.   When Bishop arrested defendant and started off with him Upshaw told him that that was his pistol the defendant had, and he wanted it.   I had never seen defendant before.

Cross-examined:  I do not remember the day of the week on which I commenced work in the saloon.   When Bishop arrested defendant he (defendant) called Upshaw, saying, "Oh, George."   It was in the afternoon when defendant was arrested.   He had been around the saloon all the time after he came in that morning.   He had been helping me do some small work about the saloon.

D. H. Hurd, a witness for the defendant, testified as follows:  I live at Dublin, Texas, and know George Upshaw.   I sold him my saloon on February 22, 1890.   I have seen a pistol in the saloon.

Cross-examined: I saw defendant after he was arrested. Mr. Marshall worked in Keith & Upshaw's butcher shop, but I do not know how long. I did business next door to said butcher shop, and was frequently in the shop, but never noticed a pistol in there. I do not remember what kind of a pistol Upshaw had in the saloon. I merely noticed a pistol there after I sold the saloon to him.

George Upshaw, Sr., for the defendant, testified as follows: I live in Erath County, Texas, where I have lived for fourteen years. In February, 1890, I was doing business in Dublin. Keith and I were in the butcher business there, and on February 20, 1890, I went into the saloon business there. My son, George Upshaw, Jr., is in the penitentiary for stealing Riley Swan's horse. He was convicted in Hood County, Texas. The pistol defendant had when he was arrested was my pistol. He came to my house on Sunday before he was arrested on Monday, staid at my house Sunday night, and we came together to Dublin on Monday, getting there about 10 o'clock a. m. I live about nine miles from Dublin. While going to Dublin I had to obey a call of nature, and when we stopped for that purpose I gave him my pistol to hold, as it was raining. He put the pistol in his pocket and wore it to Dublin. He went to the saloon with me. I did not see the officer arrest defendant, but after the officer had started off with him I told the officer that the pistol he had taken from defendant was mine, and I wanted it. Defendant was in my house once in January, 1890. He was never at my house but twice. When he was there in January it was the first time I had ever seen him. I did not let him have my pistol at any other time than that mentioned. I did not let him have it to kill Riley Swan with. I had the pistol, or it was in my shop, on the 4th, 5th, and 6th days of February, 1890. It was about the middle of January, 1890, that defendant first came to my house. I think he came there with my boy. On the Saturday before he was arrested I went home late at night. I slept late the next morning, and when I got up defendant was there. I knew nothing of him. I did not know deceased, and know nothing directly or indirectly concerning his death. I never spoke to defendant about deceased or about my son's case in Hood County. I am not certain whether defendant was at my house once or twice in January, 1890.

Jim Ellis, the defendant, testified in his own behalf as follows: I was down in the east part of this county in February, 1890, hunting horses. I was hunting four head branded T̄6. I inquired of several parties in that community if they had seen the horses. Mr. Church, at the dance, told me that he had seen some one who told him that there were some estray horses in that community. I saw Mr. Church at a dance on Tuesday night, at Mr. Carrol's house. I saw Charley Swan, and had about the same conversation with him as he says I did. I was at Dave Kyle's house for dinner on Wednesday, and

had the conversation with him that he says I did. I had a conversation with Riley Swan on Wednesday. I went from where Charley Swan was plowing down to where Riley Swan was plowing. I gave Riley Swan the description of the horses, and he came to the fence, where I was sitting on my horse, and I took a blank leaf out of my note book I had in my hip pocket and gave it to Riley Swan. He let me have a short lead pencil he took from his pocket, and I wrote the name "Wiley Swan" in my book—the same book I got the leaf from which I gave him. I had no pencil. Riley Swan remarked that he was afraid to leave his horses, and went back to his plow. With the pencil he let me have he wrote the description of the horses on the leaf I had given him. He leaned up against his plow and put the paper or leaf on his knee while he was writing. I went to Fort Worth on Monday, February 4, 1890. On Tuesday, the next day, I came to Parker County, six or eight miles east of Weatherford. On that night I went to a dance with Jim Blackwell at the house of Mr. Carrol. I danced one set. I got Jim Blackwell to keep my pistol while I was dancing. I had with me a large, bright, white-handled pistol. [Here the pistol claimed by Upshaw was shown him.] My pistol looked like this one. I afterward sold my pistol to a man named Robinson, at Brownwood, who was a horse racer. On Wednesday night, the 5th of February, I staid all night with Arthur Kirkwood and wife and Wiley Roberts and wife, who were camped at the Clear Fork bridge. They told me they were moving from Comanche County to Grayson County, Texas. Mr. Upshaw did not let me have his pistol. I did not go to Riley Swan's house; I did not see him after I saw him plowing in the field on Wednesday morning. I did not kill Riley Swan. I hunted out in the woods near Mr. Ray's, and having been at the opera at Fort Worth the night before, I was sleepy, and tied my horse and went up in the woods and took a nap. I was sent to the penitentiary from the District Court of Cooke County, Texas, and since I escaped I have been changing my name so as to keep from being caught. That is the reason I have been going under an assumed name. I hunted that range out on Tuesday and Wednesday. I did not want to give Charley Swan my true name, because it might lead to my arrest as an escaped convict. I only talked to Riley Swan for the purpose of getting him to hunt for my horses if possible. I had nothing to do with his killing.

Cross-examined: My true name is Nat Brooks. After I left the party at Carrol's I slept out in the woods the rest of the night near the place where I ate supper. The people I staid with Wednesday night were campers, and were strangers to me. I had never seen them before, nor have I seen them since. They told me their names, and I remember their names as stated in my testimony already given. I did not write down their names. They said they were going to Grayson County, from Comanche County. I bought the horses I was hunting from a

horse racer named Hardin, at Brownwood, Texas. They got away from me there. I turned them out every day on the range at Brownwood, and put them up at night. They were all branded as stated above. I gave $40 each for them in money. I left Brownwood in the early part of January, 1890, to hunt for the horses, and went to Fort Worth. Before I went to Fort Worth I went to George Upshaw's house, in Erath County, and staid all night there; this was some time in January, 1890; I don't remember the time in the month. It took me ten or twelve days to reach Fort Worth. I went through the country horseback, riding a bay horse blind in one eye, and he was a good one. I do not remember the name of any one I staid with until I got to Upshaw's. I staid all night with a farmer near Stephenville, whose name I do not remember. The next night I staid with a farmer this side of Stephenville; the next night with a farmer a little the other side of Lipan; the next night with a farmer a little this side of Lipan. Do not remember the name of either of the farmers. The next night I staid on this side the Brazos River, up the river in Parker County, where I camped out. The next night I staid in Weatherford, at a hotel on North Main Street, but do not remember the name of the hotel. I did not register my name; the hotel did not keep a register. I put my horse at the rock livery stable. The next night I staid in Weatherford, at the Arkansas wagon yard. The next night on Mary's Creek, having that day, which was Sunday, passed through the Riley Swan neighborhood. I do not remember the man's name I staid with. On Monday night I staid at Fort Worth, at a hotel, but do not remember the name of the hotel. I did not register. I went to the opera, and was up late that night. I left Fort Worth early Tuesday morning, and came out to the place where I tied my horse and took a nap. That night I went to the dance at Carrol's. I danced one set and paid for two. I did not want to dance, but Blackwell insisted upon it. On Wednesday night I staid with the campers named above on the Clear Fork, about one and a half miles from where I saw Charley and Riley Swan. The next night I staid west of Weatherford, near the Brazos River; made a dry camp. The next night I staid with a farmer in Hood County, whose name I do not remember; the next night with a man in Erath County, named Thomas, whose other name I do not remember; the next night with a man named Brown, whose first name I do not remember. I do not remember the names of any other persons I staid with on my way back to Brownwood, nor until I came back to Upshaw's, where I staid the night before I was arrested. I knew Mr. Anderson in Weatherford; had known him out west, but did not make myself known to him. I knew Mr. McFall, and worked awhile at the McFall House, in Weatherford, about eight years ago. He came to the jail, but failed to recognize me. I knew Henry Swan about eight years ago, but had not seen him since until I

was arrested.  I know no one else in Weatherford that I can name.  I had no particular home, but was stopping at Brownwood.  I talked with Riley Swan about twenty minutes.  The little memorandum book offered in evidence is mine.  The leaf read in evidence, on which Riley Swan wrote the description of the horses I was hunting, and my name that I gave him, came out of my said book.  I wrote the name "Wiley Swan, seven miles east of Weatherford," in said book.  This is the book taken from my person when I was arrested.  Riley Swan came from his plow to the fence and got the book, and then went back to his plow and wrote the description with the book on his leg, he resting against his plow handles, or rather the part that comes from the plow up between the handles.  He then brought the book back to me and gave me his pencil, and I wrote the name in the book, standing on the ground with my foot resting on the fence, and book resting on my leg.  I then got back on my horse.  I did not get over in the field.  Riley Swan, when talking to me, was thirty or forty feet away.  He said he was afraid his horses would not stand, and he went back to the plow after he got the book.  His pencil was a little short one, and he got it out of his pocket.  When I told Charley Swan I had no paper, I forgot about this little book, which I then carried in my hip pocket.  I had no pencil; had left my pencil with the bookkeeper at the dance.  The boots I have on are the same I wore when I talked with Charley and Riley Swan.  I got acquainted with George Upshaw, Jr., in Gainesville, in December, 1888, and with George Upshaw, Sr., in Erath County, in January, 1890.  I did not put down the names of the campers, and forgot them for awhile, but have thought them up since.  When I told Charley Swan I had no paper, it was before I had the conversation with Riley Swan.

Defendant introduced in evidence the clerk's stub book, showing that he had caused an attachment to be issued from the court in May, 1890, for Arthur Kirkwood and wife and Wesley Roberts and wife, to Grayson County, Texas, said attachment being lost.  Also, attachments to same county for same witnesses, issued November 15, 1890, which were returned November 17, 1890, by the sheriff of Grayson County, with indorsement that said witnesses, after strict inquiry, could not be found.

Charley Swan, a witness for the State, reintroduced in rebuttal, testified as follows:  I could not say whether or not the deceased had a pencil with him.  He generally had a pencil in his Sunday vest pocket.  I did not see a pencil in deceased's clothes, or about his house.  I did not see deceased leave his plow and go to where defendant was sitting on his horse.  I could not see them all the time.  As I said before, there was a swag in the land I was plowing which prevented me from being in sight of them all the time, and my back was toward them half the time, and I paid no particular attention to them.

Henry Owens, a witness for the State, in rebuttal, testified as follows: I helped undress and dress the body of deceased. Did not see any pencil in his pockets or about his person.

Cross-examined: There may have been a pencil in his pocket, but I did not see it. I did not see any money in his pockets either. I had my horse stolen at the same time Riley Swan's was stolen. I went to Granbury to court. There was a man by the name of Light that was also accused of stealing our horses. He has never been tried. He got away.

James Meeks, a witness for the State, in rebuttal, testified as follows: I was present when the inquest was had over the dead body of Riley Swan. I did not see any pencil about his clothes, nor hear of any. I found the hole in the back of deceased's head. I could run my finger in the hole.

Cross-examined: Several persons were present at the inquest. I could not say there was not a pencil about the clothes of deceased; there might have been and some one may have gotten it.

Dave Shaw and Henry Morris, State's witnesses, also testified that they did not see or hear anything of a pencil being found in the pockets or on the person of deceased.

Lewis Swan testified for the State that he was present when they dressed deceased, and the clothes of deceased were taken out doors. Witness did not see a pencil about said clothes.

J. F. Church, a witness for the defendant, testified as follows: I was brought here by the State. I was at a dance at Carrol's in February, 1890. I saw defendant there. He asked me about two head of horses branded $\widehat{T6}$. I told him that Jim Kyle had told me about some estray horses, but they did not suit the description of his, I thought. I will not be positive, but I think he inquired for only two head. He seemed to be inquiring naturally about the horses, and I saw nothing excited or suspicious about him.

*Harvy W. Kuteman,* for appellant.

*R. H. Harrison,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—Appellant was convicted in the court below of murder in the first degree, and his punishment has been fixed by the verdict and judgment at a life term in the penitentiary.

We have given no little time to a consideration of the facts as presented to us in this record, and we are constrained to say that the evidence upon which the defendant's guilt rests amounts to nothing more than a bare presumption, based in part upon remote suspicious circumstances, some of them of questionable admissibility as evidence against the defendant, without which there is not the slightest testimony going

to show any reason or motive on the part of defendant to commit so base and foul an assassination.

We can not give our assent to a conviction resting upon such remote, inconclusive, and unsatisfactory inculpatory evidence, and do not believe it should be permitted to stand as a precedent.

The theory of the State was that appellant, who was an entire stranger to and had never seen deceased until the day before he was killed, had been bribed to kill him, in order to destroy his evidence in a certain criminal case pending in another county. This theory is predicated upon facts and circumstances which can be explained, and which, in our opinion, have been explained, so far as defendant is concerned, consistently with his innocence. We do not say that the State's theory is not correct; nor do we pretend to say that defendant may not be guilty of this murder, but we do say that before he is punished with a lifetime imprisonment for it in the penitentiary we should be furnished with evidence of guilt sufficient to justify us in relying upon the verdict with abiding confidence that at least the jury were fully warranted in their findings.

Because the evidence, in our opinion, is wholly insufficient to support the verdict and judgment, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Judges all present and concurring.